The first case called for argument is in re the Marriage of Phillips. Council, whenever you're ready, you may proceed. May it please the Court, Mr. Wells, I'm Anthony Garibaldi and I represent Kathy Phillips, the petitioner in the underlying dissolution of marriage action in the appellate. In this matter, we've asked the Court to review the trial court's judgment of dissolution of marriage dated December 16th of 2008, in particular the maintenance award contained therein, and we've asked the Court to reverse that portion of the trial court's decision. This is a classic maintenance case, and I'll give a recitation of the facts to demonstrate why. The petitioner, Ms. Phillips, filed a petition for dissolution on July 18th of 2007, alleging grounds of adultery and mental cruelty, grounds of mental cruelty were later established in this case, and she was seeking relief in the form of permanent maintenance in an equitable division of marital property and debt and an award for attorney's fees and costs. The Court entered an order on August 13th of 2007 regarding matters of temporary relief and required that the respondent, Mr. Phillips, pay my client temporary maintenance in the amount of $5,646.74 per month and an additional month's sum maintenance payment of $3,000 to be applied to for attorney's fees and costs and also required Mr. Phillips to make certain repairs and improvements on the marital home. All remaining issues were later tried over two court sessions on May 14th and June 16th, 2008. And as I stated before, this is a classic maintenance case, and what makes it a classic maintenance case, largely length of marriage, the nature of the party's relationship, the income, and the lifestyle of the marriage. This is a high-income household, and exhibits introduced at trial and cited in our briefs show that in years 2004, 2005, and 2006, the parties had an adjusted gross income of $272,000 plus, $293,000 plus, and $342,000 plus. In those years respectively, that income growth trend continued and expanded on into 2007, and the parties adjusted gross income in that year was $583,000. Of that $583,000, more than $540,000 was earned by the respondent, Mr. Phillips. Mr. Phillips consistently earned considerably more money than Ms. Phillips throughout the marriage. Ms. Phillips, at the time of the divorce in this case, was a retired home economics teacher whose sole income, excluding the temporary maintenance award that I mentioned earlier, was a retirement payment of roughly the amount of $4,400 a month with a net income of roughly $3,500 a month, as shown in her financial statement. Mr. Phillips' financial statement filed at the time of trial showed that he had a total gross income per month in 2007 of $22,019 per month. He shows on an exhibit on his financial statement an additional regular income of $17,349 per month. His quote-unquote regular income at that point in time was $39,368 per month. He has another exhibit showing the Schedule C income for that year of $313,148 per month, a number of $26,095.66. The disparity in income in this case is a gross disparity in income. And it is also the case that although the parties' children were emancipated, the parties had for some time been the legal guardians of one of their grandchildren, a child named Kobe, who since the separation had become the responsibility of my client, Ms. Phillips. She was providing a home for him and support for him. And this is something the parties had been doing basically since the child's infancy. And the child is now 11, roughly 10 or 11 at the time of trial. The child's expenses as included on Ms. Phillips' financial statement are roughly $1,700 a month. As I mentioned before, the parties had a pretty high and extravagant lifestyle. They lived in a roughly 4,200-square-foot home with a swimming pool. The mortgage payment on that house is roughly $2,100 a month. They took expensive vacations. One family trip to Disney World, as I recall, was about $10,000. Mr. Phillips liked to take golf trips. He took four or five golf trips, I believe, even while since separation, to Arizona and Florida. He purchased a BMW. And actually there's a suggestion that the extravagant lifestyle was all the responsibility of my client. And there's a suggestion that there's evidence of a false standard of living here. But with respect to this lifestyle question, I would have a direct court's attention to actually disposition of property in this case. Mr. Phillips got the more expensive car. He got the BMW. My client got the Honda. He got the more expensive jewelry. He's the one who took the golf trips. He enjoyed living on the golf course and the fees associated therewith. And the court in this case awarded my client permanent maintenance in the amount essentially of $650 per month. Is it actually a maintenance award? It is. It's designed somewhat atypically. Or is it the equivalent of a maintenance award, which is what the trial judge said? Right. And I think he's treated it as a maintenance award. I agree with you, Judge. It's a little bit hard to determine exactly what it was. If it's not, there should have been a maintenance award. It should have been in a high amount. If it is, it's too low. And what your honor is making reference to is it was basically a, quote, unquote, disproportionate share of retirement income such that it amounted to basically $650 a month to my client. And it's insufficient to meet her needs, her shown needs, and it's certainly insufficient to meet her needs taking into account the lifestyle the parties enjoyed during the marriage. My client was given the home, which is a substantial home, but it's encumbered by a roughly $240,000 mortgage with a $2,100 mortgage payment. Mr. Phillips was awarded $25,000 in equity out of the home. My client was given time to refinance. But aside from that substantial asset and annuity she was awarded, she doesn't have any income producing property. And the mortgage on the home and the needs of the child that she's raising with the consent and agreement of Greg's husband now, who's the co-guardian of this child, basically absorb her net income on a monthly basis. And... With respect to the grandchild, there's no legal, you're not arguing that there's any legal obligation to support that child, are you? I'm not arguing that he owes the child, but they're co-guardians and... But that's a voluntary act and could be withdrawn at any time, I take it? That is true. But as a matter of fact, she does have a legal obligation so long as there's an order in effect appointing a guardian of that child to care for that child. So she can't not provide for the child so long as she's a legal guardian. And frankly, he's a legal guardian too. They're co-guardians of this child. It just so happens that the child lives with and is supported by my client. And this is a child who is active in sports. I mean, he's taken tennis lessons that are rather expensive. I believe swimming lessons and other sorts of activities that take quite a bit of money. And it's an 11-year-old child. They're just expensive. She's got that expense with a net income of roughly $3,500 per month and a $2,100 mortgage payment at this point in time. And the only sort of justification, given justification, that I can see even in the judgment for an award this low is that Mr. Phillips has intentions of slowing down. But there's no evidence in the record at all that he had been slowing down. I mean, his incomes had been rather large and exploded in the year right before trial. And there's been some evidence or at least some suggestion in the record that one of these business relationships he had, not that it would discontinue, but it may not be quite so lucrative, his relationship with Amerisco, 2007 was sort of a goldmine year. But there's no indication that his income would drop below $250,000 going forward, even if he just maintained the existing relationships he had and he didn't have one of these bad years. So in light of the lifestyle the parties enjoyed during the marriage, which is a 40-year marriage, and these people are 60, Mike Lyons, Mr. Phillips is 62, the income that Mr. Phillips could be earning, the fact that Mike Lyons is a retired home-ec teacher who cared for the children, allowed him to achieve a doctorate degree while they were married, she took care of the house. In light of the fact that she's of 60 years of age and caring for a child, it may not be her own biological child, but it's a child that she feels morally obligated and is now legally obligated to care for, the standard of living during the marriage, the length of the marriage, her age, her contribution to his furtherance of his educational career during the course of the marriage, maintenance is certainly appropriate in this case. And maintenance of a much larger amount than $650 per month, which can't even meet her show needs now, much less even appropriate the needs based on the lifestyle that the parties enjoyed for a large part of that 40-year marriage, is just woefully insufficient. And there's no way for her to maintain these needs that she has to pay for them unless she just disposes, liquidates some of the property that she was awarded in the divorce petition, contrary to Illinois state law, we cite the Embry decision in our brief, that's not the intention of state law to have her simply liquidate her property to live. And I would point out that during the period of time that Mr. Phillips was paying this nearly $5,700 a month temporary maintenance, he was able to keep saving money. His checking account and savings account show roughly $13,000 in there at the time of trial. As I mentioned earlier, he was able to purchase by cash a BMW automobile. He was able to go to a number of golf trips. He was maintaining two apartments. One is roughly in Springfield, Illinois, where he was doing a lot of work, and another one in Fairview Heights where he could see the grandchild fairly frequently. So he's maintaining two households, making these rather substantial maintenance payments, and putting money in the bank. In the meantime, my client was going $38,000 in debt. So in light of all that, we'd ask that the court reverse, or frankly, do what it did in the Keefe decision. This court, in the Keefe decision, which we cite in the law rather extensively in our brief, modified the maintenance agreement. The Keefe decision is really on all fours in this case, with this case, except it's distinguishable in two significant respects. One, the marriage is 20 years shorter, and the wife is 20 years younger. The disparity— The wife also had almost no transferable skills, as I recall, because I think I offered that case. You did, Your Honor. And that is the case. My client is a retired woman. She has a master's degree, I believe. She does. She has a master's in home economics, Your Honor. And taught—did she retire from teaching? She did. And she's receiving her retired pay. The roughly $4,400 gross income per month I mentioned is her retired pay. That and the now $650 per month, ostensibly, would be the sole extent of her income. She was working also part-time as a substitute teacher. For the two months leading up to trial, she was averaging basically $400 a month additional income from subbing. But even if she were to go back to work full-time or something approximately full-time, her income would be—or her income potential is nowhere near what her ex-husband's is. I mean, not even close. And he testified that these business relationships are going to continue. It's just that this one Amerisco project that was so lucrative in that one year may not necessarily be there in future years. But as Your Honor mentioned, the Heath decision, although the absolute numbers weren't as large, I mean, I think the disparity in income was comparable. She had roughly $15,000 a year in income. He had, in round numbers, roughly $100,000. She was taking care of the children. The trial court's decision had left him essentially with a negative net worth of roughly, I think, $30,000 and her with a slightly positive net worth and a $400 monthly maintenance payment in addition to her roughly $1,200 per month income from work. And this court doubled her maintenance award. And in this case, doubling the maintenance award still leaves her in the hole every month by a long shot. But what are you asking us to do with the modification? Your Honor, something approximating the temporary maintenance award, I think, is a good start. That's at least in the ballpark in this case. The $650 per month is just so woefully inadequate and unsupported by the record that I think it has to be reversed. Unless the panel has some more questions. I don't believe we do. Thank you, counsel.  Counsel? Counsel, you've finished your honor. May it please the court, my name is Robert Wells. I'm here representing Bill Phillips. It's important to remember when we're here, why we're here and why we're not here. And why we're not here is just as important as why we are here. There is no challenge to the award of property in this case. And why is there not a challenge to the award of property in this case? You've just heard my opposing counsel recite a number of very high income years. So why aren't we arguing about a lot of hard assets that are there? And the simple matter is, there weren't. They hadn't been accumulated. You'll see in the record as far as the assets that were there and how they were divided. And how were they divided? You'll see on page 1718 of my brief, I've set forth a comparison between the two. It's $171,000 in net assets versus $65,000 in net assets. My client is $65,000 in net assets. What he's responsible for are income taxes that were owed for 2007, joint income taxes owed for 2007. Counsel's also referenced money that's in my client's bank account. Money wasn't in my client's bank account, $13,000. But against that bank account were the money he owed for 2007 taxes, as well as gross money he received in 2008 for which he had not made the estimated taxes for. Taxes for which he was responsible into the future. So we in essence have a situation in which my client ends up with very little of the marital assets, with reference to this case, as compared to his wife's. Accumulation of marital assets and what she ends up with. And she gets her annuity, which is a significant factor with reference to this, because that annuity is something that she gets to control how and when she uses it. I would suggest to the court that this case is a case of four C's. And those C's I would say would be consumption, capacity, choices, and consequences. The consumption deals with the false standard of living the trial court found. And although counsel has referenced various things that have taken place with reference to how the parties live, I would suggest to the court that the consumption was usurped rather than established during this marriage. There were multiple times in which my client was surprised by the accumulation of debt. Here we have my client surprised on three separate occasions. And yes, those occasions do not amount to dissipation because the marriage was not derivativesly broken down. But they are consequences as to why the parties did not accumulate assets and were a relevant factor for the trial court, which the trial court considered. We had this treasure trove, which accumulated in 2007. My client made an obscene amount of money in 2007. There's no disputing that. But what happened to that money? As soon as my client realized he had that money, he was shocked with $120,000 worth of consumer debt that accumulated during the marriage. Consumer debt that had to be paid off with after-tax dollars as a result of it. So that once in a lifetime award that he got with reference to this one employer, and they subpoenaed that employer. He came to court. He testified. This isn't going to happen again. First, they're not building as they did before. We're not going to make arrangements like this. And he's not going to be paid. It was referenced that my client had continued relationships. Yes, he did. But if you look at the Amoresco situation, in that particular case, he actually owed that company money. There was an account payable by him in the sense, before he could earn any more money from that company, he had to pay back money that had been given to him. So that $13,000 that's in his bank account was a draw against future earnings that he was going to have to get from that company. So I suggest to you that we don't have a situation in which we have, quote, the classic case for maintenance. I have set forth in the brief before you information relative to a comparison with the Kemp case and this case. And that gets back to, after the consumption aspect, the capacity aspect. And the court properly noted this is not the classic case of maintenance, where you have someone who has been kept out of the job market, who has been kept with limited skills. It's not an individual, as it was in the Carpenter case, in which you had somebody coming in with those needs. It's not a case in the Kemp case where I believe she was an assistant cook or a Kemp cook's helper in that case. It's not a case where a person had OCD or something else in which they did not have the capacity to do something. We have a woman here with a master's degree plus 15 hours. That master's degree plus 15 hours makes her close to having a doctorate degree if she chose to have it. Now, what did she do? And how does capacity come into play? Capacity comes into play as what were her opportunities? She chose to retire. The court found that she chose to retire. My client didn't oppose it, but at the time she said she was going to get another job. She did get a part-time job for a limited period of time. But what happened when we came to court? When we came to court, we presented evidence, undisputed evidence, as to what her opportunities were at that time, evidence which was never abutted, which showed clearly she had opportunities to make not $400 per month, it counts as reference, but monies between $20,000 and $80,000 that she could make on top of her retirement if she chose not to go back to work full-time, which was another option that was available to her. The way she could do that, one, in my brief, I have a copy of an opportunity that existed for her with reference to one school district. It almost was designed for her. It gave her her specialty, home economics, or I think it's called consumer sciences, and it gave her an opportunity to work part-time, which enabled her to have the opportunity to keep her full retirement and work part-time. Mr. Wells, this argument, though, in my mind, flies a little bit in the face of your argument. So you're asking us to consider a job that she doesn't have, but we can't consider the income that he does currently have because he may not have it in the future. So, I mean, to me, that seems a little bit in contrast. May I throw the contrast? Sure. First, a person seeking maintenance has an obligation to show that they have tried. They have an obligation to show that they have attempted. In this case, the record is clear. Not only did she not try for this, she didn't look for this. She was not looking for further employment at the time. So we have a situation in which there is a duty and obligation on her part to do something. Contrasting to that, we have a situation in which counsel references my client's income from 2007, which he acknowledges as inflated for those years, for that one year, with my client's right to have an opportunity to slow down, which he testified he wanted to do. Why would he want to slow down? He's 63 years of age. He's overweight. He's overworked. He has diabetes. He expected to work a few years before retirement in order to build up a little nest egg for things. And what happened? The first thing that happened is the nest egg was ripped away by $125,000 in consumer debt. The next thing that happened to him is the fact that he's involved in a divorce case with reference to the expenses with that. And then the final thing that takes away some of the allure of the money that he was hoping to accumulate was that Uncle Sam had his hand out there for money that they had spent yet had not accumulated. One of the examples in the past was the fact that money that he had earned was to be put aside in a bank account for taxes the following year. That money was spent. And as a result of that, they fall behind in taxes each of those years. And when we talk about the standard of living, who is the one who supposedly established the standard of living? We have tickets to the St. Louis Parkers, tickets to the opera, tickets to the symphony, payment of expenses of hundreds of dollars for lessons for a child for which there is no obligation to support. And the court inquires, is there a legal obligation for that child? No, there is not. In essence, what the support would be would be compelling my client to pay to his wife money for supporting that child. I was struck by this one comment that was made in oral argument, and that is, we, in essence, my client paid for this child's expenses. His client paid with my client's money for the child's expenses during this period of time because there was temporary support that was being paid during that period of time. My client should not be compelled to pay child support to a grandchild, which he loves and will provide support for directly, but he should not be ordered by a court to pay support for a grandchild by the means of maintenance in this case. But more importantly, Your Honors, the situation in this case is the trial court did give the equivalent of maintenance. The trial court did give $650 per month in maintenance in the manner in which it handled the pension. My client's pension is being reduced by $1,400 per month taken out of his pension and being paid directly to his former wife. That results in her receiving $650 more. And the pension is marital property. Yes, Your Honor. And, I mean, it seems like the trial judge said, okay, I'm going to divide this marital property pension, give the wife $1,400, and, oh, by the way, we're going to call 650 of it maintenance. In essence, that's correct, it is. I'm sorry. No, I'm done. Is that the way you see it, too? Yes, I do. And the way I show you this and the way I give you the dramatic impact of that, that $650, which my client pays for the rest of his life and his former wife receives for the rest of her life, that $650 over the course of her expected lifespan of 20 years means he's going to be paying between $150,000 and $200,000 additional maintenance for her. So even if you ordered him to pay maintenance, assuming you ordered him to pay until he's 65 years of age, two years of maintenance. But he's not going to pay. It's going to come out of his pension. And that's exactly what would have happened if it would have been just divided as a marital asset as well. True. I mean, the whole $1,400 is going to come out for the rest of her life. Yes, it is. It's all going to come out. But I'm suggesting as the court did, we already had a disparate amount of property that's been awarded in this case. And on top of the disparate amount, we had this situation. If I may just briefly touch on another matter raised by counsel because I think it's clear. In the reply brief, there's a mention made of my client's extravagant lifestyle with reference to his BMW 300 series and with reference to the Golfers. First, I need to point out the BMW that he purchased is a 2001 BMW that had a value between $15,000 and $16,000. You might want to consider that that is not your $50,000, $60,000 car, which it appears to be from the statements that's in the brief. The second thing that's in the brief, it says paying for five golf trips to destinations such as Florida and Arizona in the months leading up to trial. Well, Your Honors, I direct your attention to the record with reference that that is not what the record shows. The record shows that he may have had two remote golf trips per year during the periods of time that the parties were married. Generally, it was once a year, but there were two years, 2007 and 2008. And the 2008 trip, the second one, hadn't even been planned. I mean, had been planned, but hadn't been expended yet. The other thing that's important to understand about those trips is my client didn't want to cheat. The one trip to Tunica cost him $400. The trip to Arizona, he stayed in somebody's brother's house. The trip in Florida, they didn't pay. They drove there. They didn't fly there. And they stayed in a condo for free. I think the telling point is on page 31 of the transcript from June the 16th, which I apologize. I think it's page 192 if you do the math and the numbers there. But you'll find it on page 31. The questions being asked there is to, where did you go? You went to Arizona. That's correct. Any other trips? All right. Did you go to Phoenix? No. Did you ever plan it? And so forth. And then you have the issue of the golfing trip to Arizona. And this is on page 27, which would have been, I apologize, page 27 of the transcript. It says, where did you go? Phoenix. Answer, no. Scottsdale, no. Then he says, to Polk, which I don't even know where it is. And it says, is that a golf area known for good golf? His answer is no. It's where we have a friend who has a house we can stay. So he goes to these places not because there's some resort or golf area. He goes because he can go someplace where it's warm, and he does this. Mr. Wells, the marital house that she was awarded, was that her desire? I mean, did she want the marital house to remain living in it? She wanted the opportunity to continue to reside in the marital residence. Whether she wanted to keep it permanently was unclear. I think that's why the court orchestrated the way it did and gave her the opportunity to stay in the house because she chose to, but gave her the opportunity to sell the house because she didn't. What is the house worth? Have we got a fair market value estimate? Yes, there is. There is a value with reference to the house. I believe it's $300,000 to $320,000 was the range that comes to mind with reference to that house. And that's a very telling point as well, Your Honors, in that here you have a single individual living in a five-bedroom house with a swimming pool. Certainly, if that's her choice and that's how she wants to live her life, she has the opportunity and right to say she wants to do that. But compare that to my client. My client shares an apartment in Springfield and performs the duties and functions that he has in Springfield. He lives in an apartment or condo when he lives in town. He doesn't have those expenditures with reference to it. So, again, you have the fact that both of them lived in this house. That wasn't the case. She lived in this house and had the opportunity at any point in time during this to choose to sell the house in place of the market. My client is put in a position in which he has continued obligations at work. His wife has the opportunity to spend six months in Florida if she chooses. You do SEC's fit. I thank you for your time. Thank you, Counsel. Counsel? Thank you. Regarding counsel's argument about the party's lifestyle, it's really disputed that these people live in the $325,000 home with a pool, on a golf course, with a housekeeper. And with respect to the consumer debt that accrued during the course of the marriage, again, I think it's illustrative to look at the personal property division, in this case, as set out in the judgment. He got the BMW. She got the Accord. Yes, it's only a $16,000 BMW. She got the $5,000 Accord. In my experience, I can't recall having seen a judgment dissolution in marriage where the husband got the more valuable jewelry. This is a case like that. The personal property, in this case, the consumer debt items, on paper, tend to weigh favorably, excuse me, dramatically in such a way to indicate that he was responsible for a large portion of that sort of debt. And he did have the kind of income to win these large consumer debt bills accrued. They could simply be paid off, and they did. With respect to the disparate award of property, they have a valuable home without a whole lot of equity in it, roughly $90,000 in equity in it, $25,000 of which was awarded to Mr. Phillips. Ms. Phillips very well may have to sell this home. But if you see the way the judgment was structured, he's given the first $25,000 out of it. If she can't refinance or sell the home within 24 months following the date of judgment, he actually starts earning interest on the $25,000. So it's a strange sort of circumstance where if you're in a down market or she, because of her income, is unable to refinance, she's penalized if it takes two years to sell this home. So ostensibly her end of it goes down, his end goes up. We think that's impediment. While on paper she's been awarded a $325,000 house, it's one encumbered by a large mortgage and one that's going to be difficult for her to refinance if she wants to remain in it given her income and given the nature of the housing market, perhaps difficult to sell. And with respect to her needs, as the key decision of this court says, those needs are determined relative to the lifestyle that the parties enjoy. And I think it's been established that they enjoy a rather nice lifestyle based on a large income that was earned in substantial part by Mr. Phillips. Now, my client is now raising their grandchild. She's now over 60 years old. She's in a position where it's not easy for her just to resume full-time employment, but Mr. Phillips seems to think it's perfectly reasonable for him to just decide to slow down from his consulting and lobbying work. I mean, he's a retired superintendent of schools. In light of that, in light of the facts of this case, in light of the large amount of money earned by Mr. Phillips, the lifestyle the parties enjoy during the course of the marriage, we believe that the judgment is in error. We'd ask the court to reverse that judgment. Thank you. Thank you. Thank you. Thank you, counsel, both counsel. We appreciate your briefs and arguments. We'll take the matter under advisory.